NORFLEET v. HAMPSON.

Opinion delivered February 17, 1919.

1.  TRUSTS—ACTIVE TRUST.—A deed conveying land in trust, first, for benefit of the estate of a deceased, and then for the joint benefit of such estate and the firm of which deceased was a partner, created an active trust in favor of the parties.

2.  EQUITY—LACHES.—Delay without neglect, or which does not operate to the prejudice of the rights of the opposite party is not sufficient to constitute laches.

3.  TRUSTS—ENFORCEMENT.—The beneficiary in a deed of trust has no right to relief against the trustee where, without adequate excuse, he delayed asserting his rights until the proofs respecting the transaction out of which he claims his rights arose are so uncertain and obscure that it is difficult for the court to determine the matter.

4.  EQUITY—LACHES.—Where, on account of plaintiff's delay in bringing suit, the defendant has good reason to believe that plaintiff's alleged rights are worthless or abandoned, or where, because of

change in condition or relations of the property and parties during the period of delay, it would be an injustice to allow the complainant to assert his rights, or in case of intervening equities, laches is a bar to relief sought.

5. TRUSTS—ENFORCEMENT—DILIGENCE.—Reasonable diligence is required of the beneficiary of a trust in the assertion of his rights after obtaining knowledge thereof or of facts which should lead to knowledge.

6. EVIDENCE—JUDICIAL NOTICE.—The courts will take judicial notice of the time when the St. Francis Levee District was organized.

Appeal from Mississippi Chancery Court, Osceola District; *Archer Wheatley,* Chancellor; affirmed.

### STATEMENT OF FACTS.

This is a suit by Susie T. Norfleet against J. K. Hampson and others to recover an undivided 1242/7279 interest in the lands described in the complaint, for an accounting of the rents and profits and for a partition of the lands. The material allegations of the complaint are as follows:

Louis Hanauer conveyed the Nodena plantation to D. L. Ferguson, reserving a vendor's lien for the balance of the purchase money, $21,114.60. In addition to this debt, Ferguson seems to have been indebted to Louis Hanauer in the further sum of $17,766.03 and to Schoolfield, Hanauer & Company, a partnership composed of Louis Hanauer, W. W. Schoolfield and H. G. Miller, in the sum of $18,529.05. Hanauer procured a decree foreclosing his vendor's lien, and John B. Driver was appointed commissioner to sell. At the commissioner's sale the plantation was bid in by F. P. Poston and D. T. Schoolfield as trustees for the estate of Louis Hanauer (he having died), and Schoolfield, Hanauer & Company, the estate to have "a first lien and claim on the property, and to be first satisfied therefrom," for the $21,114.60 due it as the balance of the purchase money, "and afterwards the excess over and above said Hanauer's lien for purchase money to be distributed," pro rata on the debt of $17,766.03 due Hanauer's estate and the debt of $18,-529.05 due Schoolfield, Hanauer & Company. The sale

was confirmed by the court, and on February 14, 1891, John B. Driver executed a commissioner's deed to Poston and Schoolfield as trustees. This deed recites that "Poston and Schoolfield as trustees bought the property for the estate of Louis Hanauer who holds a first lien and claim on the same for the balance of purchase money, to-wit, the sum of $21,114.60 and then for the joint benefit and interest of the estate of Louis Hanauer to the sum of $17,766.03, and the firm of Schoolfield, Hanauer & Company for the sum of $18,529.05."

Louis Hanauer, who died prior to 1891, bequeathed his estate (after certain specific legacies) to his niece, Mary Hampson, and to her children, the appellees. By this bequest Mrs. Hampson and her children became the owners of the debt of $21,114.60 which was to be first satisfied out of the property, and of the debt of $17,766.03 and one-third of the debt of $18,529.05, which last mentioned debts were to share pro rata in the proceeds of the property after the debt of $21,114.60 was fully paid and satisfied. The claims of Mrs. Hampson and her children therefore aggregated $45,056.98 of which $21,114.60 was a first lien on the property, while the balance of the indebtedness secured by the property, being two-thirds of the debt due the old firm of Schoolfield, Hanauer & Company (which had been dissolved by the death of Louis Hanauer) amounted to $12,352.70.

On January 9, 1897, the trustees conveyed the property to Mrs. Hampson and her children, or rather to W. W. Schoolfield as trustee for them, in consideration of the $45,056.98 due them, and the assumption by Mrs. Hampson and her husband of the $12,252.70 due W. W. Schoolfield and H. G. Miller, the other two members of the firm of Schoolfield, Hanauer & Company. The deed of conveyance set forth the entire history of the property and of the transactions referred to above, and contained the following recital with reference to the deed from John B. Driver as commissioner to the trustees: "Said deed having been executed to said Poston and Schoolfield as trustees to hold the legal title thereto for the benefit of

the estate of Louis Hanauer which held at that time a
first lien and claim on said premises for the balance of
purchase money amounting at said date to the sum of
$21,114.60, and thereafter for the joint benefit and use
of the estate of Louis Hanauer to secure an indebted-
ness due him amounting to $17,766.03, and to the firm of
Schoolfield, Hanauer & Company, amounting to the sum
of $18,529.05, it being provided in said deed that the last
named debt due the estate of Louis Hanauer and the debt
due the firm of Schoolfield, Hanauer & Company should,.
after the payment of the vendor's lien in favor of the
estate of Louis Hanauer, in the event of a sale of said
property by said trustees, share pro rata according to
the amount of the debts stated in the surplus proceeds
thereof."

In the last paragraph of the deed to Schoolfield as
trustee for Mrs. Hampson and her children is the follow-
ing: "It is understood and agreed that the said Hamp-
son and wife and Schoolfield as trustee will assume and
take care of the indebtedness due to W. W. School-
field and H. G. Miller, the other two partners of the firm
of Schoolfield, Hanauer & Company, as provided in the
deed above mentioned."

The possession of the property was delivered to Mrs.
Hampson and her children at the date of the trustee's
deed to them, Janaury 9, 1897, and they have remained
in possession from that day until this, a period of more
than twenty-two years. During that time they have cul-
tivated the land, and applied the rents and profits to their
exclusive use and benefit.

On November 24, 1897, H. G. Miller executed a deed
to Susie M. Thomas, now Susie T. Norfleet, by which he
conveyed his "undivided one-third interest in the inter-
est of the former firm of Schoolfield, Hanauer & Com-
pany in and to the said Nodena plantation."

The complaint alleges that between the years 1899
and 1903, Mrs. Hampson paid the plaintiff $500 on one
occasion and $1,500 on another. No other payment was
ever made.

All the various deeds referred to were made exhibits to the complaint. Other facts alleged in the complaint will be stated or referred to in the opinion.

A general demurrer to the complaint was filed which was sustained by the court. The plaintiff refused to plead further and elected to stand upon her complaint. The court dismissed the complaint for want of equity and the plaintiff has appealed.

*G. J. McFadden* and *Carmichael & Brooks,* for appellant.

1. The original complaint sets forth an equitable cause of action and it was error to sustain the demurrer. Trust estates like this are clearly established by the laws of Arkansas and are required to be faithfully administered in accordance with the terms of the instrument creating them. 31 Ark. 400; 103 *Id.* 145. The deed of 1897 in which neither H. G. Miller nor Mrs. Norfleet joined did not affect Mrs. Norfleet's interest in the trust estate and it is still outstanding. 30 Ark. 249-266; 33 *Id.* 621; 75 U. S. 202; 3 Howard (U: S.) 401, Law. ed. 622. The legal effect of the deed of 1897 is to bind Mrs. Hampson, her trustees and her children, the defendants, to the faithful execution of the John B. Driver trust deed. By the deed of 1897 they became the owners of Louis Hanauer's debt of $21,114.60, which was a first lien on the land. By accepting that deed they undertook (1) to pay off that sum and interest to themselves and (2) then to account to Schoolfield and Mrs. Norfleet for their interest in the remainder of the property. These are matters of contract expressly set forth in the deed. 30 Ark. 249, 266; 33 *Id.* 621; 9 Baxt. (Tenn.) 100; 8 Wheat. (U. S.) 421; 9 *Id.* 489; 13 Hun. (N. Y.) 514; 11 Paige (N. Y.) 514; 11 *Id.* 459; 1 Pet. (U. S.) 299-308, 12 Law ed. 157.

2. The statutes of limitation have no application to an express trust until there is a disavowal of the trust and an open, adverse holding under a claim of right known to the *cestui que trust.* 58 Ark. 84; 46 *Id.* 25-34; 16 *Id.* 122; 75 U. S. 202, 19 L. ed. 306; 142 U. S. 338, 35

L. ed. 1035; 120 U. S. 386, 30 L. ed. 719; 8 L. R. A. 480, and annotations. *Ib.* 647 and ann. No one ever set up any claim to this property adverse to Mrs. Norfleet.

3. Mere lapse of time does not constitute laches such as will bar an action to enforce an express trust. There must be such a change in the condition of the property and parties during the lapse of time as to prejudice the rights of the defendants and render it inequitable to enforce the trust. 15 S. W. 830; 103 Ark. 251; 16 *Id.* 122; 129 Id. 94; 3 How. U. S.) 333-411, 11 L. ed. 622-657; 215 U. S. 554-577, 54 L. ed. 325, 335; 62 Vt. 123; 9 L. R. A. 517; 20 Atl. 322; 53 N. J. Eq. 313; 31 Atl. 596; 9 Baxt. (Tenn.) 100; 5 Utah 331; 15 Pac. 260; 38 Minn. 211; 36 N. W. 338; 62 *Id.* 899; 44 Neb. 463; 28 N. J. Eq. 467; 12 *Id.* 423; 28 Ohio St. 568; 96 Tenn. 252; 34 S. W. 209; 31 L. R. A. 706; 126 Fed. 593; 61 C. C. A. 515; 78 Fed. 839; 24 C. C. A. 397; 15 Fed. 912.

Courts of equity withhold relief from those who have delayed the assertion of their claims for an unreasonable length of time. Its application depends on the particular circumstances of the case. It is not mere lapse of time but of change of circumstances and situation during neglectful repose, rendering it inequitable to afford relief. 184 U. S. 450-453; 46 L. ed., 636, 656.

No new claims, rights, interests or equities have arisen. Only the rights, titles and equities created by the John B. Driver deed and reaffirmed by the deed of 1897 are now in existence. There has been no change in the condition of the property. No new parties have come forward. This suit is between the parties whose equities were created by the Driver trust deed and acknowledged by the deed of 1897. The doctrine of laches has no application. 61 C. C. A. 515; 126 Fed. 593; 78 *Id.* 839; 24 C. C. A. 397; 38 Minn. 211; 36 N. W. 388; 115 U. S. 368, 36 L. ed. 738; 152 U. S. 412, 38 L. ed. 495.

The doctrine of laches, like the statute of limitations, can only be applied to a cause of action. The time only begins to run when the cause of action arises. Here the cause of action set up could not arise until the first lien

of $21,114.60 and the interest in favor of the estate of Louis Hanauer had been paid off. Until that debt had been paid by the trustees, Mrs. Norfleet had no right to obtain her part of the property. By the deed of 1897 the trustees turned over the property to defendants on condition that they comply with all the terms of the Driver trust deed. By the same deed they acquired all of the first lien claim of $21,114.60. Hence they undertook to pay themselves the first lien claim and then devote the property to the other provisions of the trust. Just when this $21,114.60 was paid does not appear from the bill. Complainants could not know when this first lien was paid off finally, but only allege that a fair and equitable accounting will show that the entire debt has been paid and that there is a large balance of profits unaccounted for and that Mrs. Norfleet is entitled to a share thereof. The chancellor erroneously put an end to this trust as a matter of law. Unless the law fixes a limited period of time within which a trust estate can exist the decree cannot be upheld. The law fixes no such limitations on the life of a trust. The holding of the chancellor has no foundation or support in equity jurisprudence. 16 Ark. 122. There is nothing in the record, unless it be the demurrer, to show that the defendants dispute the complainant's claims. The trust is still continuing. 16 Ark. 122. The bill states a cause of action and Mrs. Norfleet's interest is still outstanding. The Driver deed created a trust estate. Mrs. Norfleet has a right and title to Miller's equitable interest in the trust estate. The deed of 1897 did not in any way affect her interest, for neither she nor Miller joined in the deed of 1897 and it does not bind them and in no way affects Mrs. Norfleet's interest. By the express terms and provisions of the deed of 1897 Mrs. Hampson and her trustees undertook and agreed to preserve and care for the interest of Miller, now hers. It shows the property intended to be conveyed and does not pretend to convey any part of the Schoolfield, Hanauer & Company's interest except the Hanauer one-third. It expressly provides that Mr. and Mrs. Hamp-

son and the trustees will assume and care for the interest of Schoolfield and Miller. Under the terms of the instrument defendants became bound to preserve the trust in favor of Mrs. Norfleet.

The law is well settled that defendants became trustees to work out the first claim due Hanauer's estate and bound to execute the Driver trust deed. All persons coming into possession of trust property with notice of the trust will be considered trustees and bound to the execution of the trust. 1 Peters 309, L. ed. 157; Perry on Trusts, § 217; 30 Ark. 249-266; 33 *Id.* 621; 8 Wheat. 421; 9 *Id.* 489, 6 L. ed. 142.

Statutes of limitation have no application to an express trust until there is a disavowal of the trust and open, adverse holding under claim of right known to the *cestui que trust.* 58 Ark. 84; 46 *Id.* 25-34; 16 Id. 122. The bill shows no transfer of trust property and no adverse holding. Neither limitation nor laches apply. 15 S. W. 830; Story Eq. Pl., § § 756-7; 14 Ark. 640; 2 Sch. & Lef. 607; 4 Blackf. 82; 5 Humph. 611; 16 Ark. 122; 3 How. (U. S.) 411, 11 L. ed. 657; 145 U. S. 372-4; 61 C. C. A. 515; 126 Fed. 593-601; 103 Ark. 251; 129 *Id.* 94; 53 N. J. Eq. 313-321; 12 *Id.* 423-429; 36 N. W. 338. A demurrer does not raise the question of laches. 101 Ark. 350. See also 122 Ark. 502; 82 *Id.* 418; 94 U. S. 806.

*Chas. T. Coleman,* for appellees.

1. Plaintiff acquired neither a legal nor equitable title to any part of the land. 129 Ark. 490.

2. She was not entitled to enforce a lien on the land; the complaint states no cause of action and she was clearly guilty of laches. The claim is stale. 57 Ark. 583; 101 *Id.* 235; 88 *Id.* 333; 83 *Id.* 385; 55 *Id.* 85; 19 *Id.* 16; 14 *Id.* 62; 120 Fed. 219. She waited too long—more than 20 years. *Supra.* The decree is right on the merits of the cause.

HART, J., (after stating the facts). On the 14th day of February, 1891, John B. Driver as commissioner of the chancery court conveyed the lands involved in this

suit to F. P. Poston and D. T. Schoolfield as trustees for
the estate of Louis Hanauer and the firm of Schoolfield,
Hanauer & Company for the sum of $45,000. Said Pos-
ton and Schoolfield as trustees purchased the property
first, for the estate of Louis Hanauer which held a lien
on said lands for the balance of the purchase money for
the sum of $21,114.60; and then for the joint benefit of the
estate of Louis Hanauer in the sum of $17,766.03 and
the firm of Schoolfield, Hanauer & Company in the sum
of $18,529.05. This deed created an active trust in favor
of these parties within the meaning of the rule in *Ran-
dolph* v. *Read,* 129 Ark. 485, as contended for by counsel
for the plaintiff. H. G. Miller was a member of the firm of
Schoolfield, Hanauer & Company and owned an undivided
one-third interest therein. He was also guardian of Su-
sie T. Thomas, a minor, and became indebted to her as
such guardian in a large sum of money. On the 24th day
of November, 1897, after Susie T. Thomas became of
legal age, Miller conveyed to her by deed his undivided
interest in the lands in this suit for the sum of $6,000,
and she succeeded to the rights and interest of Miller in
said lands. That she is entitled to an undivided 1242/7279
interest in said lands. In January, 1898, Susie T.
Thomas married M. B. Norfleet and is the plaintiff in
this action.

But the defendants invoke the equitable doctrine of
laches as a bar to the relief sought by the plaintiff. The
plaintiff in her complaint prayed for a recovery of her
undivided interest in the lands, for an accounting of the
rents and profits, and for partition of the lands. The
chancery court sustained a general demurrer to her com-
plaint and dismissed it for want of equity. Laches was
not specifically pleaded, but this was not necessary. The
defense of laches goes to the equity of the bill. That is
to say, assuming the facts stated in the bill to be true, the
bill is not maintainable as a matter of law because of
laches. *Tate* v. *Logan,* 88 Ark. 333, and *Dickson* v. *Sen-
tell,* 83 Ark. 385.

The doctrine of laches is founded on the equitable maxims of "he who seeks equity must do equity" and "equity aids the vigilant." Hence while there is a great variety of cases in which the equitable doctrine is invoked, each case must depend upon its own particular circumstances and courts of equity have always discouraged laches and delay without cause. Of course, delay without neglect, or which does not operate to the prejudice of the rights of the opposite party is not sufficient to constitute laches. It is well settled, however, that he, who, without adequate excuse delays asserting his rights until the proofs respecting the transaction out of which he claims his rights arose are so uncertain and obscure that it is difficult for the court to determine the matter, has no right to relief. So where on account of delay the adverse party has good reason to believe that his alleged rights are worthless or abandoned, where because of the change in condition or relations of the property and parties during the period of delay it would be an injustice to allow the complainant to assert his rights, or in case of intervening equities, it is generally held that laches is a bar to the relief is sought. *Casey* v. *Trout,* 114 Ark. 359; *Finley* v. *Finley,* 103 Ark. 58; *Tatum* v. *Arkansas Lumber Co.,* 103 Ark. 251; *Davis* v. *Harrell,* 101 Ark. 230; *Rhodes* v. *Cissell,* 82 Ark. 367; *Williams* v. *Bennett,* 75 Ark. 312; *Thomas* v. *Sypert,* 61 Ark. 575, and *Gibson* v. *Herriot,* 55 Ark. 85. Many other cases illustrating the court's adherence to the doctrine might be cited; but it is so well settled and has been applied in such a great variety of cases that further citation is unnecessary.

Judge Brewer, who afterwards became an Associate Justice of the Supreme Court of the United States, said while on the circuit, "No doctrine is so wholesome, when wisely administered, as that of laches. It prevents the resurrection of stale titles, and forbids the spying out from the records of ancient and abandoned rights. It requires of every owner that he take care of his property, and of every claimant, that he make known his claims. It gives to the actual and larger possessor se-

curity, and induces and justifies him in all efforts to improve and make valuable the property he holds. It is a doctrine received with favor because its proper application works out justice and equity and often bars the holder of a mere technical right, which he has abandoned for years, from enforcing it when its enforcement will work large injury to many." *Naddo* v. *Bardon,* 51 Fed. 493, 2 C. C. A. 335.

This brings us to a consideration of what the conditions are which combine to render the claim of the plaintiff stale in equity. The case was disposed of on the complaint and demurrer. As said by Mr. Justice Grier in *Badger* v. *Badger,* 2 Wall. (U. S.) 87, a person seeking to avoid laches "should set forth in his bill specifically what were the impediments to an earlier prosecution of his claim; how he came to be so long ignorant of his rights, and means used by the respondent to fraudulently keep him in ignorance and how and when he first came to a knowledge of the matters alleged in the bill; otherwise the chancellor may justly refuse to consider his case on his own showing, without inquiring whether there is a demurrer or formal plea of the statute of limitations contained in the answer." This was quoted with approval in *Gibson* v *Herriot,* 55 Ark. 85.

The complaint in this case was filed and summons issued on the 26th day of August, 1916. H. G. Miller conveyed to the plaintiff by deed his interest in the lands described in the complaint on the 24th day of November, 1897. At that time she was of legal age, and the deed recites that she was a resident of Little Rock, Arkansas. Her complaint recites that she was married in January, 1898, and that she is a resident of Forrest City, St. Francis County, Arkansas; that the defendants are residents of Mississippi County, Arkansas, and that D. T. Schoolfield, trustee, is a citizen and resident of Shelby County, Tennessee. The lands are situated in Mississippi County, Arkansas. In fact, the complaint and the various deeds exhibited with it show that all the interested parties except Susie T. Norfleet were and are residents of Missis-

sippi County, Arkansas, or Memphis, in Shelby County, Tennessee. She resided in Little Rock, Arkansas, prior to her marriage and then at Forrest City, St. Francis County, Arkansas, a county near to the county in which the lands involved in this suit are situated. The plaintiff acquired her interest in the lands on the 24th day of November, 1897, by a deed from H. G. Miller, one of the members of the firm of Schoolfield, Hanauer & Company. Louis Hanauer died before 1891, and by the terms of his will, made certain specific bequests and left the remainder of his estate to his niece, Mary Hampson, and to her children.

On the 9th day of January, 1897, W. W. Schoolfield, as executor of the estate of Louis Hanauer, deceased, and F. P. Poston and D. T. Schoolfield as trustees, and the remaining heirs and legatees of Louis Hanauer, deceased, conveyed the lands involved in this suit to Mary G. Hampson and her children. The deed was absolute in its terms. The deed, also, contained a covenant that the grantees would take care of the indebtedness due to W. W. Schoolfield and H. G. Miller, the remaining members of the firm of Schoolfield, Hanauer & Company, and would release and relieve the grantors from all obligations on account thereof. Mrs. Mary Hampson went into possession of the lands for the sole and exclusive use and benefit of herself and children, immediately after the execution of the deed and so continued until her death, and since then her children, the defendants, have been in the exclusive possession of the lands. Mrs. Hampson and her husband died several years before the complaint was filed, the exact date of their death not being mentioned in the complaint. The complaint also alleges that F. P. Poston, one of the above trustees and W. W. Schoolfield both died several years before the suit was filed. It is also alleged that between 2,000 and 2,500 acres of the land are in cultivation. That from 1897 to 1903, the fair rental value was $8,000 per annum. Since that time the fair rental value was from $12,000 to $15,000 per annum. That the lands are now worth more than $200,000. That

Mrs. Hampson has never paid plaintiff anything or accounted to her for the rents and profits, except that between the years 1899 and 1903, Mrs. Hampson made her two payments respectively of $500 and $1,500 out of the proceeds of the sale of timber. That Mrs. Hampson and her children have been in the exclusive and visible possession of these lands from the 9th day of January, 1897, to the present time. It is well settled from the authorities above cited that when the trust is repudiated and knowledge of the repudiation is brought home to the *cestui que trust,* the case is brought within the ordinary rules of laches. It has also been frequently stated by this court that notice of facts and circumstances which would put a man of ordinary intelligence and prudence on inquiry is equivalent to knowledge of all the facts a reasonably diligent inquiry would disclose. Reasonable diligence is required of the plaintiff in asserting his right after he obtains knowledge of it, or facts which should lead to knowledge. The reason is that with lapse of time, ability to prove the truth regarding the transaction is lessened and delay ripens into conclusive evidence of acquiescence or abandonment. The plaintiff did not attempt to explain her delay in bringing the suit. More than 19 years have elapsed from the time that Mrs. Hampson and her children went into the exclusive and visible possession of the lands until the plaintiff commenced this suit. During all this time, the plaintiff lived in the vicinity of the lands. She knew that it was a valuable plantation and that its rental value was constantly increasing. The court will take judicial notice that the St. Francis Levee District was organized and the levees constructed during this time. That the construction of this system of levees completely changed conditions within the boundaries of the district and that the lands in it have greatly enhanced in value. During all this time, the doors of the chancery court were open to her; and the recitation of the facts and circumstances above referred to, all of which are alleged in her bill, show that she must have known that Mrs. Hampson was in possession of the land and of

the changes going on around her. At least the circumstances were of such a character as to have reasonably imposed upon her the duty of inquiry, and inquiry would have led to knowledge of the facts. Mrs. Hampson, F. P. Poston, one of the trustees, and W. W. Schoolfield, the executor of the will of Louis Hanauer, deceased, have been dead for several years, and cannot give their version of the transaction. An accounting is asked of the rents and profits. This would be a difficult matter on account of the death of Mrs. Hampson. It is insisted that the fact that Mrs. Hampson paid plaintiff $500 at one time and $1,500 at another on the sales of timber, shows that the former recognized the rights of the latter. An accounting of the rents and profits would necessitate an examination of the affairs of the partnership of Schoolfield, Hanauer & Company, and an accounting of the same. Then, too, if Mrs. Hampson, were alive, she might be able to explain this transaction. The conditions have been completely changed by the death of some of the principal actors, and the consequent loss of their testimony. It cannot be known how much the rental value was due to the management of Mrs. Hampson, or to the financial risks she incurred in managing the lands.

Under the facts and circumstances alleged in the bill, the long unexplained delay of the plaintiff in asserting her claim is fatal to her right to recover, as said by the learned chancellor, whose opinion was adopted by the court in *Cunningham* v. *Brumback,* 23 Ark. 336, "the law wisely holds that there shall come a time when even the wrongful possessor shall have peace; and that it is better that ancient wrongs should go unredressed than that ancient strife should be renewed."

It follows that the decree must be affirmed.